FILED
2013 Apr-05  AM 09:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

REX A. PHILLIPS and,           )
MARY M. PHILLIPS,              )
                               )
          Plaintiffs,          )
                               )
vs.                            )          Case No. 5:09-cv-2507-TMP
                               )
MORTGAGE ELECTRONIC            )
REGISTRATION SYSTEMS, INC.;    )
MERSCORP, INC; ONEWEST BANK, FSB, )
                               )
          Defendants           )

MEMORANDUM OPINION

This cause comes before the court on the motions for summary judgment by both the plaintiffs and the defendants.  Defendants, Mortgage Electronic Registration System, Inc., and MERSCORP, Inc., (collectively referred to as "MERS") and OneWest Bank, FSB ("OneWest"), filed their motion for summary judgment on May 1, 2012 (Docs. 54 and 55), as did the plaintiffs, Rex and Mary Phillips (Docs. 56 and 57).  Both motions have been fully briefed.  These parties have consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge.  (Doc. 44).[1]

I.  Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[1]  Several defendants named in the original complaint have been dismissed.  Defendants Roger Stotts, Matthew Allen Banaszewski, Laura Hescott and Kal. J. Haines were dismissed by the court's order of September 27, 2010 (Doc. 30).  Defendants Lender Processing Services, Inc., and LPS Default Solutions, Inc., were dismissed by agreement of the parties on June 5, 2012 (Doc. 62). The only parties now remaining in the action are those named above in the text.

as a matter of law." Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify

which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d

256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  <u>Anderson</u>, 477 U.S. at 254; <u>Cottle v. Storer Communication, Inc.</u>, 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  <u>Anderson</u>, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

II.  <u>Admissibility of Marks Affidavit</u>

A preliminary evidentiary issue raised by plaintiffs is whether the affidavit of Rebecca Marks, attached to the defendants' motion for summary judgment as Exhibit A, is admissible, or whether it must be stricken, as plaintiffs argue.  Plaintiffs assert that the Marks Affidavit fails to comply with the Rule 56 requirements for affidavits in that parts of it are not based on the affiant's personal knowledge, it offers inadmissible evidence, and it fails to show how the affiant is competent to testify to the matters in the affidavit.  <u>See</u> Fed. R. Civ. P. 56(c)(4).[2]

At the outset, the Marks Affidavit identifies Rebecca Marks as "the Default Litigation Manager for OneWest Bank, FSB" and that she was "fully authorized to make this Affidavit on

---

[2] "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

behalf of OneWest Bank." (Doc. 55-1, p. 2 of 10).[3]  As part of her "job functions, [she is] familiar with business records maintained by OneWest Bank for the purpose of servicing mortgage loans." Further, "[t]hese records (which include data compilations, electronically imaged documents, and others) are made at or near the time by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records, and are kept in the course of business activity conducted regularly by OneWest Bank." (Id. at pp. 2-3 of 10).  Also, she testified that, "It is the regular practice of OneWest Bank's mortgage servicing business to make these records.  In connection with making this affidavit, I have personally examined these business records." (Id. at p. 3 of 10).  Nevertheless, based on her review of the records, throughout the affidavit Marks testified to events occurring at and involving other entities, such as Quicken Loans, Inc., and IndyMac Bank, with whom she has no apparent employment or agency relationship.  Plaintiffs argue that Marks's affidavit, thus, contains testimony about which she has no personal knowledge and is based only on the records maintained by OneWest Bank, and that such evidence fails to comply with the Rule 56(c)(4) requirements.

　　This particular evidentiary issue has been addressed by a number of courts, all of whom have concluded that when business records pass from a predecessor entity to a successor entity under a merger or receivership, the successor entity is able to authenticate the business records of its predecessor.  For example, the district court for the Northern District of Illinois, in a case in which one bank took over the assets of a failed bank through an FDIC receivership, has explained:

---

[3] The numbering refers to both the document number and the page number assigned to the affidavit by the court's CM/ECF system at the time the document was electronically filed.

The record reflects that although Maxwell [the affiant] did not work for Midwest and was not a custodian of Midwest's records, Maxwell would constitute a qualified witness since the records of Midwest became FirstMerit's records as the successor bank. *See United States v. Jakobetz,* 955 F.2d 786, 801 (2nd Cir.1992) (stating that "[e]ven if the document is originally created by another entity, its creator need not testify when the document has been incorporated into the business records of the testifying entity"). In addition, other courts have held that a successor bank that has acquired a failed bank through the FDIC can satisfy Rule 803(6) with the declaration of an employee of the successor bank. *See, e.g., U.S. Bank Nat. Ass'n v. American Screw & Rivet Corp.,* 2010 WL 3172772, at *3 (N.D.Ill.2010) (holding that witness from successor bank could authenticate records of bank that went into receivership); *Krawczyk v. Centurion Capital Corp.,* 2009 WL 395458, at *5 (N.D.Ill.2009) (indicating that a bank can rely on its predecessor's business records and that "[u]ltimately, the primary emphasis of Rule 803(6) is on the reliability or trustworthiness of the records sought to be introduced").

FirstMerit Bank, N.A. v. Balin, 2012 WL 4017948, *3 (N.D. Ill. Sept. 11, 2012). As a business record certified by a custodian under FRE 803(6), the records become self-authenticating under FRE 902(11).[4] This assessment of FRE 803(6) is based on the practical consideration that "it would be extremely difficult for a successor bank to recover debt owed to a failed bank,..., since the custodian of the failed bank's records may no longer be able or willing to participate in efforts to recover debts owed to the bank that went into receivership. Such a standard would inhibit the FDIC in its receivership role when it must find solvent banks to take over insolvent banks." Id. at *4.

More important, this reading of FRE 803(6) has been adopted by the Eleventh Circuit also. In United States v. Parker, the court of appeals rejected a claim that a "Certificate of Spirits Exported to the United States of America" was improperly admitted into evidence when no custodian from the predecessor entity testified to its authenticity. The court reasoned:

---

[4] FRE 902(11) states in pertinent part that a document is self-authenticating if it is "The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court."

Parker's second contention is that a document identified as a Certificate for Spirits Exported to the United States of America was improperly admitted under Fed. R. Evid. 803(6), the business records exception to the hearsay rule. To be admitted under that exception "the person who actually prepared the documents need not have testified so long as other circumstantial evidence and testimony suggest their trustworthiness." *Itel Capital Corp. v. Cups Coal Co.,* 707 F.2d 1253, 1259 (11th Cir.1983). *See United States v. Veytia-Bravo,* 603 F.2d 1187, 1191-92 (5th Cir.1979), *cert. denied,* 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d 658 (1980); *United States v. Flom,* 558 F.2d 1179, 1182 (5th Cir.1977). Nor is it required "that the records be prepared by the business which has custody of them." *Veytia-Bravo,* 603 F.2d at 1191.

United States v. Parker, 749 F.2d 628, 633 (11th Cir. 1984). The requirements for meeting the FRE 803(6) exception to the hearsay rule for business records does not require testimony by some witness associated with the predecessor entity when the records become part of the records of a successor entity.

The records identified in Marks's affidavit are records produced by OneWest Bank, maintained in the ordinary course of its business. Some of the records came to OneWest after it acquired IndyMac Bank's and IndyMac Federal Bank's assets through the FDIC. To authenticate these records, " the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FRE 901. Certainly, Marks, as OneWest's employee, can testify on personal knowledge that the business records offered are what they purport to be – OneWest's business records. The fact that she can certify (testify under oath) that the records are OneWest's business records also authenticates them under FRE 902(11). Under the case authority discussed above, it does not matter that it is now an employee of OneWest testifying about records it received by merger or receivership from a predecessor bank.

7

Moreover, the Rule 56(c)(4) requirement of personal knowledge can be met by a review of the records themselves.  "[P]ersonal knowledge can be based on a review of relevant business files and records." Duke v. Nationstar Mortgage, L.L.C., 893 F. Supp. 2d 1238 (N.D. Ala. 2012); see also Mid–Continent Casualty Co. v. Don Brady Construction Co., ___ F.Supp.2d ___, 2012 WL 1598149, at *2 (S.D.Ala. May 7, 2012)(quoting In re Trafford Distribution Center, Inc., 414 B.R. 858, 862 (Bktrcy.S.D.Fla.2009) ("[A]s a matter of law, 'personal knowledge can come from the review of the contents of business files and records.'")).  Thus, insofar as Marks testified about what the records reflect, she is doing so on personal knowledge gained from a review of the records.

It is clear, therefore, that Marks's affidavit identifying the relevant documents as her employer's business records meets both the Rule 56 requirement of personal knowledge and the FRE 803(6) exception to the hearsay rule.  It is not necessary under FRE 803(6) that a custodian formerly employed by IndyMac or IndyMac Federal or the FDIC testify about the business records as long as OneWest now incorporates them as part of its own business records.  Marks's affidavit sufficiently authenticates the records and shows they are records maintained in the ordinary course of business, and, by reviewing the documents, Marks is able to testify on personal knowledge to what the records reflect.  The plaintiff's motion to strike is hereby DENIED.

III.  Undisputed Facts for Summary Judgment Purposes

Because both the plaintiffs and defendants have filed motions for summary judgment, the court is required to view the evidence through two different lenses.  While addressing the plaintiffs' motion, the court must view the evidence favorably to the defendants.  Likewise, while analyzing the defendants' motion, the court must view the evidence favorably to the plaintiffs.  Much of the

evidence, however, is actually undisputed, and the court will treat it the same in regard to both motions.

### A. Facts Favorably Viewed to Plaintiffs

Taking first the facts and evidence viewed in a light most favorable to the plaintiffs, the following facts appear to be undisputed.[5]

Plaintiffs are the owners of a house and real estate located in Crane Hill, Alabama.  On June 27, 2006, plaintiffs executed a promissory note to Quicken Loans, Inc., in the amount of $156,750.00, payable in a monthly mortgage payments of $1,029.74 to Quicken Loans, Inc. (Doc. 55-2, p. 2 of 22).  To secure the indebtedness, the plaintiffs also executed a mortgage on the Crane Hill property to defendant Mortgage Electronic Registration Systems, Inc., as nominee for Quicken Loans, Inc., its successors and assigns, as the mortgagee.  (Doc. 55-6, p. 2 of 17).  The mortgage explicitly explained:

> (C) "MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the mortgagee under this Security Instrument.

The "Lender" was explicitly identified as Quicken Loans, Inc.  (Id. at p. 3 of 17).  In executing the mortgage, the plaintiffs "irrevocably mortgage[d], grant[ed] and convey[ed] to MERS (solely as nominee for Lender and Lender's  successors  and assigns) and to the successors and assigns of

---

[5]   The record contains two sets of purported stipulations of fact.  On October 3, 2011, defendants filed a unilateral "stipulation" of facts (Doc. 43), but there is no evidence that plaintiffs ever agreed with these stipulations.  Later, on April 6, 2012, the parties jointly file certain stipulations (Doc. 51) different from those in defendants' document 43.  Insofar as document 51 is a joint stipulation of facts, it is binding on all parties.  Document 43, however, does not appear to be a true stipulation as there is no evidence the plaintiffs joined it or agreed to it, and the court will not consider it in the evidence of the case.

MERS, with power of sale, the following described property located" in the Cullman County, Alabama.  (Id. at p. 4 of 17).  In connection with that transfer of legal title, the mortgage stated further:

> Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and *to take any action required of Lender* including, but not limited to,  releasing and canceling this Security Instrument.

(Id.) (Italics added).  Section 22 of the mortgage also reads as follows:

> 22.    Acceleration;  Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

Id. at p. 14 of 17).  The mortgage was recorded on July 12, 2006, in the Office of the Judge of Probate of Cullman County.

10

A few weeks later, plaintiffs were sent a notice dated September 5, 2006, informing them that the loan servicing rights under the promissory note they executed had been transferred from Quicken Loans, Inc., to a division of IndyMac Bank, effective September 1, 2006.  (Doc. 55-2, p. 6 of 22). Slightly more than a year later, IndyMac Bank sent a notice to the plaintiffs dated November 16, 2007, that the plaintiffs were default under the note.  (Doc. 55-2, p. 10 of 22).  The notice informed the plaintiffs that they had to cure the default by paying $3,575.80 by December 18, 2007, to bring the note current.  (Doc. 55-2, p. 10 of 22).  On January 24, 2008, an attorney, acting on behalf of IndyMac Bank, notified the plaintiffs that the note was being accelerated and the entire balance of debt becoming due in full.  The letter stated:

> YOU ARE HEREBY NOTIFIED that, pursuant to the terms of the Promissory Note and Mortgage dated the 27th day of June, 2006, to Mortgage Electronic Registration Systems Inc. as nominee for Quicken Loans Inc., said mortgage having subsequently been transferred and assigned to IndyMac Bank, F.S.B. and by virtue of default in the terms of said Note and Mortgage, IndyMac Bank, F.S.B. hereby accelerates to maturity the entire remaining unpaid balance of the debt, including attorney's fees, accrued interest, and other lawful charges, and the amount due and payable as of this date is $162,245.48.

(Doc. 55-2, p. 13 of 22).  The notice letter went on to inform the plaintiffs that foreclosure proceedings would begin if the balance was not paid in full by a date certain, with an anticipated foreclosure sale on February 27, 2008.  The notice of the foreclosure sale had yet to be published in a Cullman County newspaper.

On February 8, 2008, acting over the signature of Laura Hebscott, MERS assigned the mortgage executed by the plaintiffs to IndyMac Bank, F.S.B.  (Doc. 55-2, p. 15 of 22).  The assignment operated to assign the mortgage and all interests in the property described in the

mortgage, "together with the note and indebtedness secured by the Mortgage, and all interest of the undersigned in and to the property described in said Mortgage." (Id.)  It appears, however, the assignment was never recorded in the land records of Cullman County, Alabama.  The foreclosure planned for February 27, 2008, never occurred as IndyMac withdrew it when the parties began negotiating a loan modification.

On April 1, 2008, plaintiffs and IndyMac entered into loan modification agreement, which lowered the plaintiffs' monthly mortgage payment to $775.17 for a period of five years, beginning May 1, 2008.  In part, the agreement provided that "6 months of interest and advances will be capitalized at 6.875% totaling $6,417.20 and the loan re-amortized over 460 months. When payments resume on May 1, 2008 the new Unpaid Principal Balance will be $161,253.22." (Doc. 55-2, p. 17 of 22).  The loan modification agreement expressly identified IndyMac Bank as the "Lender," even though the parties have stipulated that the indebtedness was owned by Fannie Mae. (Doc. 51).  Further, it provided:

> Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.  Except as otherwise specifically provided in the Agreement, the Note and Security Instrument will remain unchanged and the Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement.

Doc. 55-2, p. 18 of 22.

After the loan modification agreement with IndyMac Bank was completed, IndyMac failed in July 2008 and was taken over by the FDIC.  All of IndyMac's assets were transferred to a new entity, IndyMac Federal Bank.

Notwithstanding the loan modification agreement, the plaintiffs again defaulted on payment of the original 2006 note.  On September 25, 2008, the plaintiffs entered into a HomeSaver Advance Loan with IndyMac Bank,[6] under which IndyMac loaned to plaintiffs $6,194.85, which loan proceeds were applied "to Borrower's delinquent first lien loan, IndyMac Loan Number: 3001949902, to fully reinstate such loan."  (Doc. 55-2, p. 20 of 22).  The purpose of this HomeSaver Advance loan was to bring the mortgage indebtedness current.  By its terms, no interest accrued during the first six months of the HomeSaver Advance loan and no payments on it were due during the first six months.

The only payment the plaintiffs made under the April 1, 2008, loan modification agreement was on November 17, 2008, in the amount of $1,030.61.  Four months later, still in default on payments under the note, the plaintiffs were sent a second acceleration notice dated March 18, 2009. (Doc. 55-4, p. 2 of 9).  The notice was sent by an attorney acting for IndyMac Federal Bank, and it informed the plaintiffs that a foreclosure sale was planned for April 22, 2009.  The very next day, March 19, 2009, IndyMac Federal Bank failed and the FDIC transferred its assets to OneWest Bank in a purchase and assumption agreement.  This included the right to service the mortgage loan of the plaintiffs.  Notwithstanding the acceleration notice, plaintiffs were sent a notice dated April 15, 2009, that the mortgage loan servicing had been assigned to OneWest Bank.  (Doc. 55-4, p. 4 of 9). The April 22 foreclosure did not proceed.

On May 1, 2009, MERS again executed another assignment of mortgage, purportedly assigning MERS's interest in the plaintiffs' mortgage to OneWest Bank.  (Doc. 55-4, p. 7 of 9).  This

---

[6] The HomeSaver Advance loan documents refer to the lender "IndyMac Bank," except that an allonge to the loan dated September 26, 2008, is signed in the name of IndyMac Federal Bank. The court infers that the true lender was IndyMac Federal Bank because it is undisputed that IndyMac Bank had been liquidated by the FDIC.

assignment, identical to the previous assignment, was executed by Roger Stotts as vice president of MERS.  Unlike MERS's first assignment of the mortgage, this assignment was recorded in the Cullman County, Alabama, land records.

The parties have stipulated that "[t]he mortgage assignments that were prepared either by LPS when IndyMac was the servicer of Plaintiffs' loan or by OWB [OneWest Bank] when OWB was the servicer of Plaintiffs' loan occurred when neither IndyMac nor OWB was the owner of the indebtedness" and "[a]t the time of the mortgage assignments in this case, the owner of the indebtedness was Fannie Mae."[7]

Because the plaintiffs continued to fail to make payments under the note, they remained in default, and on September 24, 2009, an attorney acting for OneWest Bank mailed yet a third acceleration notice to the plaintiffs, informing them that the full balance of the note was now due and that a foreclosure under the mortgage was planned for October 28, 2009.  Thereafter, plaintiffs filed suit in Cullman County Circuit Court, which issued a temporary restraining order to stop the foreclosure.  To date, the plaintiffs' property has not been foreclosed and they remain in possession of it even though they have not paid on the mortgage note since November 2008.

IV.  Analysis of Defendants' Motion for Summary Judgment

Defendants MERS and OneWest Bank move for summary judgment with respect to all of plaintiffs' claims.  In their Amended Complaint (Doc. 29), the plaintiffs allege claims for slander of title (Count One), trespass (Count Two), negligent or wanton hiring or supervision (Count Three),

---

[7]  It is not clear precisely what the parties mean by saying the Fannie Mae was the owner of the "indebtedness."  The court assumes this means that the original note to Quicken Loans had been sold or assigned in some way to Fannie Mae and that Fannie Mae was entitled to collection of the payments under the note.  As will be discussed below, the first assignment of the mortgage had a very different effect.

civil conspiracy (Count Five), and wantonness (Count Six).[8]  Defendants point out that despite all of the notices and the plaintiffs' undisputed default in their indebtedness, no actual foreclosure of the plaintiffs' property has ever occurred.  Plaintiffs remain in possession of the Crane Hill property even though they have not paid anything toward their debt since November 2008.  Defendants contend that all of the actions they have taken are legal and properly supported by the note and mortgage documents executed by the plaintiff in 2006.

A.  Slander of Title

Turning to each of plaintiffs' claims in this action, the court must examine whether there is substantial evidence supporting the elements of each claim pleaded by the plaintiffs.  Whether there is a *genuine* dispute of a *material* fact turns on whether there is substantial evidence establishing each element of a claim.  A dispute is not *genuine* if the evidence is not substantial, that is, is not of such a quality that a reasonable jury could return a verdict based on it.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  Likewise, a factual dispute is not *material* unless it relates to an element of a claim or defense.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Under Alabama law, the elements of a slander of title action are the following:

> (1) Ownership of the property by plaintiff; (2) falsity of the words published; (3) malice of defendant in publishing the false statements; (4) publication to some person other than the owner; (5) the publication must be in disparagement of plaintiff's property or the title thereof; and (6) that special damages were the proximate result of such publication (setting them out in detail).

---

[8]  Plaintiffs have expressly abandoned their claim of unjust enrichment in Count Four of the Amended Complaint.  See Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Doc. 60, p. 12 of 15.

Dabbs v. Four Tees, Inc., 36 So. 3d 542, 558 (Ala. Civ. App. 2008) (internal quotation marks omitted), quoting Folmar v. Empire Fire & Marine Ins. Co., 856 So. 2d 807, 809 (Ala.2003); see also Merchants Nat'l Bank of Mobile v. Steiner, 404 So.2d 14, 21 (Ala.1981); Womack v. McDonald, 219 Ala. 75, 76-77, 121 So. 57, 59 (1929).  The act of the defendant "against which a slander-of-title action is taken must have been false *and* malicious when it was performed." Folmar, 856 So. 2d at 809.  Malice "requires 'proof that [the defendant] intentionally disparaged [the] plaintiff's title to the property slandered or *recklessly* disparaged [it] *without information sufficient to support a bona fide belief* ' in the veracity of the disparaging statement.'" Dabbs, 36 So. 2d at 558 (quoting Roden v. Wright, 646 So.2d 605, 611 (Ala. 1994); see also  Harrison v. Mitchell, 391 So.2d 1038, 1041 (Ala. Civ. App. 1980) (emphasis added).  "In other words, 'if the defendant had probable cause for believing the statement, there can *in law* be no malice.' [Merchants Nat'l Bank of Mobile v.] Steiner, 404 So. 2d [14] at 21 [ (Ala. 1981) ] (emphasis added)."  Dabbs, 36 So. 2d at 558 (quoting Roden v. Wright, 646 So. 2d 605, 611 (Ala. 1994).

None of the actions taken by defendants was with malice for purposes of a slander-of-title claim.  It appears that the "publications" plaintiffs assert slandered their title to the Crane Hill property were the three notices of foreclosure published in a Cullman County newspaper in February 2008 and April and October 2009.  Plaintiffs argue that these notices were both false, in that no one had the right at those times to invoke the power of sale under the mortgage, and malicious because the defendants knew they had no lawful right to invoke the power of sale.  For the reasons explained below, the court disagrees

Plaintiffs' contention that no valid power of sale existed under the mortgage arises from the position of MERS as the mortgagee.  Plaintiffs correctly observe that the promissory note was

16

executed by plaintiffs to Quicken Loans, Inc., while the mortgage securing the note and containing the power of sale was conveyed to MERS "as nominee for [Quicken Loans, Inc.,] and [its] successors and assigns." They contend that Alabama law does not allow the separation or splitting of the indebtedness and the mortgage securing the indebtedness, and that doing so here rendered the security of the mortgage and the power of sale invalid. They acknowledge that the debt memorialized in the note continues to exist, but assert that no one now has the lawful power to foreclose under the mortgage.

Defendants point to the case of <u>Crum v. LaSalle Bank, N.A.</u>, 55 So. 3d 266 (Ala. Civ. App. 2009), as support for their position that the existence of MERS as Quicken Loans' nominee mortgagee was lawful. <u>Crum</u> is an ejectment action following a mortgage foreclosure. There, as in this case, the plaintiff borrowed money from a lender and executed a promissory note in favor of the lender. To secure the note, the plaintiff conveyed a mortgage to MERS as the nominee of the lender. Later, acting as the nominee for the lender, MERS assigned the mortgage to an "assignee (acting as a trustee of a designated mortgage-loan trust)," <u>Crum v. LaSalle Bank, N.A.</u>, 55 So. 3d 266, 268 (Ala. Civ. App. 2009), who then foreclosed on the property. After the foreclosure sale, the plaintiff refused to vacate the property and the assignee commenced an ejectment action to get possession of the property.

The Alabama Court of Civil Appeals affirmed the grant of summary judgment in favor of the assignee, saying:

> The borrower, on appeal, does not dispute that she was in default of her repayment obligations. Rather, in an effort to impugn the validity of the assignee's title, she reiterates as her first issue on appeal her contention, first made in the trial court, that the assignee did not have the power to sell the property in response to her default.

17

Under Ala. Code 1975, § 35–10–12, which superseded Ala. Code 1975, § 35–10–1 (a similarly worded statute), with respect to mortgages executed in 1989 or later, a power to sell lands given in any mortgage "is part of the security" and may be exercised "by any person, or the personal representative of any person who, by assignment or otherwise, *becomes entitled to the money thus secured* " (emphasis added). The borrower contends that because MERS, which was specified in the mortgage instrument as the lender's nominee and as the mortgagee, was not shown to have owned the debt, MERS could not convey any right to the assignee whereby the assignee would, in the words of the statute, have "become[ ] entitled to the money ... secured" by the mortgage. The borrower cites *Carpenter v. First National Bank of Birmingham,* 236 Ala. 213, 215, 181 So. 239, 240 (1938), as supporting the proposition that "an agent of [a mortgage] holder to whom the mortgage is delivered merely for the purpose of foreclosure, having no ownership of the debt, is not authorized to foreclose in his own name, and execute a deed in his name to the purchaser."

We perceive two factors that distinguish this case from *Carpenter.* First, in this case, MERS and the assignee were not delivered a mortgage instrument by a mortgagee "merely for" the purpose of effecting a "foreclosure," as was apparently the case in *Carpenter.* MERS was instead expressly acknowledged by the borrower in the mortgage instrument itself as not only having "any or all of [the lender's] interests" in the mortgaged property, but also as having the power "to take any action required of" the lender. The mortgage instrument further expressly provided that the note and the mortgage could be sold without prior notice to the borrower, and the assignment by MERS to the assignee of the mortgage, the note, and "all moneys" due was undertaken for consideration that included a $10 payment to MERS. Thus, taken together, the pertinent documents indicate (a) that MERS was authorized to perform any act on the lender's behalf as to the property, including selling the note and the mortgage to a third party; and (b) that MERS fully exercised that power in favor of the assignee for valuable consideration.

Second, the rule of *Carpenter* assumes that there has been a divergence in the legal and equitable ownership of a debt and the security for the repayment of the debt. **The generally prevailing common-law rule, however, is that "a transfer of a mortgage also transfers the obligation the mortgage secures unless the parties to the transfer agree otherwise."** *Restatement (Third) of Property: Mortgages* § 5.4(b) (1997); *see also id.* at comment c, illustration 5 (when mortgage assignment makes no mention of a note, ownership of the note will pass to the assignee with the mortgage). This principle of law is recognized in Alabama as well. *See Seabury v. Hemley,* 174 Ala. 116, 121, 56 So. 530, 531 (1911) (assignment of mortgage held "broad enough to include the [secured] debt[ ] in the absence of any evidence showing a separate or different assignment of the note"). Thus, it was stated in *Union Bank & Trust Co. v. Thompson,* 202 Ala. 537, 538, 81 So. 39, 40 (1919), following *Seabury,* that no party, other than an innocent purchaser of notes

evidencing the secured debt, would be in a position to raise the question "whether or not the debt had been assigned."

Crum v. LaSalle Bank, N.A., 55 So. 3d 266, 268-70 (Ala. Civ. App. 2009) (internal footnote omitted).  Crum clearly states that Alabama follows the common-law rule that an assignment of the mortgage, in the absence of language evidencing otherwise, also transfers the debt secured by the mortgage, except as to innocent purchasers of the note.[9]

The Alabama Court of Civil Appeals again in 2012 rejected the idea that splitting or separating the mortgage and the debt evidenced in a note renders the power of sale in the mortgage void.  In Nelson v. Federal National Mortgage Association, 97 So. 3d 770, 775 (Ala. Civ. App. 2012), the court stated plainly, "The Nelsons argue that the power-of-sale provision in the mortgage instrument was unenforceable because the note and mortgage had been separated. This court has recently rejected that argument because it does not comport with Alabama law."  The separation of the note and mortgage does not render either document void, although it may raise complex questions about what party possesses the right to exercise the power of sale in the mortgage.

The facts in the instant case, shorn of unnecessary complexity, show that the plaintiffs executed a promissory note to Quicken Loans and a mortgage to MERS, as the nominee of Quicken Loans, to secure the note indebtedness.  At some point in time, the parties have stipulated, the indebtedness evidenced in the note came to be owned by Fannie Mae.  Although Quicken Loans assigned its servicing rights to IndyMac, it was only servicing rights, not ownership of the note

---

[9]  In the instant case, the express language of the mortgage not only gave MERS the power to do anything "required of [the] lender," the mortgage assignment also expressly provided that it transferred the rights in the property described in the mortgage "together with the note and indebtedness" secured by it.  See Doc. 55-2, p. 15 of 22.  Thus, the language of the mortgage did not express other than that the common-law rule of the indebtedness following the mortgage applied.

indebtedness.  As the servicer, IndyMac Bank notified the plaintiffs on January 24, 2008, that it was accelerating the maturity of the note due to their default.  On February 8, 2008, "for value" MERS assigned the mortgage "together with the note and indebtedness secured by the Mortgage" to IndyMac Bank.[10]  Under the terms of the mortgage, MERS had the power to do anything required of the "Lender" or its assignees, and it exercised that power by assigning the mortgage and the debt secured by it to IndyMac Bank.  Thus, under Alabama law, the assignment of the mortgage by MERS operated to assign the *note indebtedness* as well to IndyMac.  See Crum v. LaSalle Bank, *supra*., at 270.[11]  On February 8, 2008, IndyMac Bank became the owner of both the indebtedness *and* the power of sale in the mortgage.  Thereafter, IndyMac's assets (including the mortgage and note indebtedness of the plaintiffs) were transferred to IndyMac Federal Bank through the FDIC, and then from IndyMac Federal Bank to OneWest, where they reside today.

---

[10]  The court does not accept the defendants' argument that the failure to record the mortgage assignment in the Cullman County land records rendered it effectively inoperative.  While the lack of recordation may create issues of notice and priority, it did not make the assignment a nullity. MERS's assignment was fully effective in transferring the mortgage, "together with the note and indebtedness secured by the Mortgage," to IndyMac Bank as of February 8, 2008.  This does not change the outcome of the case, however.  Under Crum, title and ownership of the mortgage and the note indebtedness proceeded thereafter through the asset transfers following the failures of IndyMac Bank and its immediate successor, IndyMac Federal Bank.  Ultimately, OneWest received ownership of both the mortgage and indebtedness by transfer of assets from IndyMac Federal Bank.  In any event, if for some reason the 2008 assignment of the mortgage by MERS was ineffective, the 2009 assignment would have cured the defect.  At worst, the 2009 assignment was meaningless as MERS no longer retained any mortgage rights after the 2008 assignment.

[11]  "The generally prevailing common-law rule, however, is that 'a transfer of a mortgage also transfers the obligation the mortgage secures unless the parties to the transfer agree otherwise.' *Restatement (Third) of Property: Mortgages* § 5.4(b) (1997); *see also id.* at comment c, illustration 5 (when mortgage assignment makes no mention of a note, ownership of the note will pass to the assignee with the mortgage).  This principle of law is recognized in Alabama as well.  *See Seabury v. Hemley,* 174 Ala. 116, 121, 56 So. 530, 531 (1911) (assignment of mortgage held 'broad enough to include the [secured] debt[ ] in the absence of any evidence showing a separate or different assignment of the note')."

Returning to plaintiffs' slander-of-title theory, it becomes clear that it fails for several reasons.  First, when the foreclosure notice was first published in February 2008,[12] the only party responsible for the publication was IndyMac Bank, which is now defunct and not a party to this litigation.  Neither MERS nor OneWest were involved in the decision to publish the notice, and they cannot be liable for the purported falsity of it.  Second, even if MERS could be regarded as being involved (certainly OneWest was not involved), the publication was not malicious — MERS had probable cause to believe that the planned foreclosure of the plaintiffs' property was valid and legal.  Plaintiffs were clearly in default of the indebtedness, they had mortgaged their property to secure the debt, and MERS was the holder of the mortgage entitled to enforce the power of sale.  Thus, not only was the publication — the foreclosure notice — not false, it was not malicious.  That remains true also as to the subsequent notices of foreclosure.  Notwithstanding the separation of the note and mortgage, both MERS and OneWest had a legitimate and *bona fide* belief that they were entitled to foreclose the mortgage to collected the defaulted debt of the plaintiffs.  Defendants are entitled to summary judgment on the claim of slander of title.

B. Trespass

Plaintiffs' Count Two alleges a claim for trespass, in that "[t]he actions of the defendants constitute a trespass against the plaintiffs and their right to the quiet enjoyment and peaceful possession of their property."  To prove a trespass to real property, the plaintiffs must offer substantial evidence that the defendants entered onto their land without permission, causing damage to the realty.  "'Trespass' has been defined as '[a]ny entry on the land of another without express or

---

[12]  Of course the notice letters to the plaintiffs themselves cannot support a slander-of-title claim because the publication of false information about their land title must be to some *other* person, not the plaintiffs.  See Dabbs v. Four Tees, Inc., 36 So. 3d 542, 558 (Ala. Civ. App. 2008).

implied authority.'" Colbert v. First National Bank of Atmore, 75 So. 3d 145, 148 (Ala. Civ. App. 2011), cert. denied (Aug. 5, 2011), quoting Central Parking Systems of Alabama, Inc. v. Steen, 707 So.2d 226, 228 (Ala.1997)(quoting Foust v. Kinney, 202 Ala. 392, 393, 80 So. 474, 475 (1918)). There simply is no evidence in this case, substantial or otherwise, that MERS or OneWest, or their agents, entered onto the plaintiffs' land.

Plaintiffs contend, citing W.T. Ratliff v. Henley, 405 So. 2d 141 (Ala. 1981), that defendants caused an "indirect trespass" by commencing the foreclosure proceedings on three occasions. They assert that "[i]t was at all times reasonably foreseeable that a foreclosure carried to completion would invade the plaintiffs' possessory interest and would create substantial damages to the plaintiffs and their interests." (Doc. 60, p. 12 of 15). The problem with this argument is that *no* foreclosure was ever carried to completion. While foreclosure proceedings were commenced on three occasions, none was ever completed. The mere fact that foreclosures were commenced cannot amount to an "indirect trespass," and Ratliff does not assist plaintiffs in that regard. Ratliff was a case where sand and gravel from a surface mining operation washed onto the plaintiff's property. Not surprisingly, the Alabama Supreme Court held that such was enough to state a claim for trespass even though none of the defendant's employees ever went onto the plaintiff's land. It was enough that the defendant's mining operations indirectly caused sand and gravel to wash over onto the plaintiff's land, causing damage. That simply does not exist in this case. There is no evidence of any actual entry onto or damage to the plaintiffs' land. Defendants are entitled to summary judgment on this claim.

C.  Negligent/Wanton Hiring, Supervision, and Training

In Count Three, plaintiffs allege that "Defendant OneWest Bank, FSB in this action negligently or wantonly hired, trained, supervised or retained the defendant, LPS," resulting in damages to the plaintiff.  LPS is a former defendant in this action, dismissed voluntarily by the plaintiffs.  There is no evidence, substantial or otherwise, adduced by the plaintiffs in this action tending to show some improper or illegal action by LPS for which OneWest is responsible.  The evidence simply fails to show what LPS did or failed to do that might be actionable.  "[I]n order for an employer to be liable for the negligent hiring, training, retention, and supervision of its employee, the plaintiff must also prove 'wrongful conduct' on the part of the employee." Jones Exp., Inc. v. Jackson, 86 So. 3d 298, 304 (Ala. 2010), citing University Fed. Credit Union v. Grayson, 878 So. 2d 280, 291 (Ala. 2003) ("[A] party alleging negligent supervision and hiring must prove the underlying wrongful conduct of the defendant's agents."); Voyager Insurance Cos. v. Whitson, 867 So. 2d 1065, 1073 (Ala. 2003) ("A party alleging negligent or wanton supervision and hiring must also prove the underlying wrongful conduct of employees."); Thrasher v. Ivan Leonard Chevrolet, Inc., 195 F.Supp. 2d 1314, 1320 (N.D.Ala. 2002) ("In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed ... [a] tort.").  Defendants are entitled to summary judgment on this claim.

D.  Civil Conspiracy

Count Five of the Amended Complaint alleges that these defendants, MERS and OneWest, participated in a civil conspiracy to fraudulently treat plaintiffs' note and mortgage as in default and to increase the charges they were required to pay.  In part, Count Five alleges that "[t]he defendants

engaged in an unlawful combination and conspiracy to service mortgage loans which they treated as either in default or not in default in such a manner as would generate to the defendants illegal fees and charges," and that "[t]his practiced [sic] resulted in improper and undeserved payments for those fees and charges added to the accounts of unsuspecting borrowers including the plaintiffs and the collection of those sums and distribution of those sums to the members of the conspiracy."

Alabama law defines a cause of action for civil conspiracy as "the combination of two or more persons to do (a) something that is unlawful, oppressive, or immoral; or (b) something that is not unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means; or (c) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means." Barber v. Stephenson, 260 Ala. 151, 155, 69 So. 2d 251, 253 (1953). However, "[t]he gist of an action alleging civil conspiracy is not the conspiracy itself but, rather, the wrong committed." Keith v. Witt Auto Sales, Inc., 578 So. 2d 1269, 1274 (Ala. 1991); Hooper v. Columbus Regional Healthcare System, Inc., 956 So. 2d 1135, 1141 (Ala. 2006). Defendants contend that plaintiffs cannot prove an underlying "wrong" because the foreclosure notices, accelerations of the note, and the consequential charges were all lawfully provided by the note and mortgage.

Plaintiffs have not presented evidence otherwise. They have not shown that there is a genuine dispute as to whether any charges or other actions taken by the defendants were not legal under the note and mortgage executed by them. While they contend that neither OneWest nor MERS possessed the power of sale in the mortgage, the court has rejected that assertion because the mortgage was conveyed to MERS by the plaintiffs, which assigned it to IndyMac Bank, and upon the failure of IndyMac (and thereafter IndyMac Federal Bank), the asset of the mortgage was conveyed, assigned, or transferred to OneWest through the FDIC's receivership of the failed banks.

24

Under Crum, the conveyance or assignment of the mortgage, in the absence of evidence indicating the parties intended otherwise, carried with it the indebtedness itself, despite the stipulation of the parties that Fannie Mae was the owner of the debt.  Thus, IndyMac Bank, IndyMac Federal Bank, and OneWest all in turn properly exercised the right to accelerate the debt and foreclose the mortgage.  There was no underlying fraud, illegality, or oppression on which a civil conspiracy could rest.[13]  Defendants are entitled to summary judgment on this claim.

E. Wantonness

Lastly, plaintiffs alleged in Count Six of their Amended Complaint that the defendants engaged in wanton conduct.  They pleaded that the defendants, with reckless indifference to whether their actions would harm the plaintiffs, did the following:

> [D]efendants consciously took actions including the production of fraudulent and forged documents affecting interests in real estate, misrepresented their rights to foreclose, consciously and deliberately engaged in conduct designed to confuse and mislead the plaintiffs, claimed legal rights which they lacked and otherwise acted with malice to obtain possession of the property of the plaintiffs for the purpose of garnering to themselves the payments of fees and other compensation.

---

[13]   The court notes that the amended complaint seems to allege that the civil conspiracy's purpose also included the "wrongful foreclosure" of the plaintiffs' mortgage.  Aside from the fact that plaintiffs have not alleged a substantive claim for "wrongful foreclosure," the undisputed evidence simply does not show one under Alabama law.  A claim for "wrongful foreclosure" exists under Alabama law only to the extent that it is alleged and evidence shows that the foreclosure was undertaken for an improper purpose.  For example, the Alabama Supreme Court only last year confirmed that a claim for wrongful foreclosure is stated only "where 'a mortgagee uses the power of sale given under a mortgage for a purpose other than to secure the debt owed by the mortgagor.'" Jackson v. Wells Fargo Bank, N.A., 90 So. 3d 168, 171 (Ala. 2012)(quoting Reeves Cedarhurst Dev. Corp. v. First American Fed. Sav. & Loan Ass'n, 607 So. 2d 180, 182 (Ala. 1992)).  There is simply no evidence in this case that the attempted foreclosures were for any purpose other than collection of the debt owed by the plaintiffs.  Thus, there can be no claim for "wrongful foreclosure."

(Doc. 29, ¶ 81, p. 14 of 16).  As already explained above, there is no evidence that the note, mortgage, or any of the assignments or other documents were forged or fraudulent.  Although there was sloppy handling of these financial instruments, there is no evidence of any fraudulent intent. Plaintiffs do not and cannot dispute that they owed a debt on money they borrowed and that they mortgage their property to secure the debt.  They cannot and do not now dispute that they are in default on the debt and have been so for several years.  Their argument that the separation of the note and mortgage somehow invalidated the power of sale in the mortgage has been rejected by Alabama law and this court.  Importantly, despite all of the document assignments, failed banks, and foreclosure notices, the plaintiffs' property still has not been foreclosed and they remain in possession of it.  They have suffered no injury and, indeed, have experienced a financial windfall in that they have lived on the Crane Hill property for several years without paying toward the debt owed on it.  There is no evidence that defendants wantonly engaged in any conduct injurious to the plaintiffs, and they are entitled to summary judgment on this claim.

V.   Analysis of Plaintiffs' Motion for Summary Judgment

Plaintiffs too have filed a motion for summary judgment, contending (1) that the defendants failed to properly accelerate the note indebtedness and this precludes a proper foreclosure, (2) that the May 1, 2009, mortgage assignment by MERS to OneWest Bank is defective and cannot empower OneWest to foreclose the mortgage.  The court is unpersuaded by either argument.

A.   Defective Acceleration

First, the plaintiffs claim that none of these defendants has properly accelerated the indebtedness as a condition precedent to foreclosure.  But even if that is correct, it does not warrant a permanent injunction prohibiting the defendants from doing so now or in the future.  None of the

foreclosures attempted in the past ever came to completion.  Whether defendants can correctly do so in the future is another matter.  As to past foreclosure attempts, any ineffectiveness in the acceleration of the debt is meaningless because no completed foreclosure ever took place.  A mere defective attempt at accelerating the debt, standing alone, does not create a cause of action for damages nor does it preclude a proper acceleration in the future.

Even so, the court is dubious that the note as not been properly accelerated.  The acceleration provision in the mortgage in this case states the following:

> 22.  Acceleration;  Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

On November 16, 2007, IndyMac Bank mailed a notice of default to the plaintiffs.  It informed the plaintiffs that they were in default for non-payment under the note, it told them how to cure the default, and it gave them until December 18, 2007, to do so.  (Doc. 55-2, p. 10 of 22).  Additionally, the notice stated:

> If you do not cure your default, we will accelerate your mortgage with the full amount remaining accelerated and becoming due and payable in full, and foreclosure proceedings will be initiated at that time.  Failure to cure your default may result in the foreclosure and sale of your property. A deficiency judgment may be obtained against you to collect the balance of your loan.
>
> You may, if required by law, have the right to cure your default after the acceleration of your payments and prior to the foreclosure sale, by paying all amounts past due within the time permitted by law.  In addition to the past due amounts, you will be required to pay reasonable fees and costs incurred by IndyMac Bank.  You may have the right to bring a court action to assert the non-existence of a default or any other defense you may have to acceleration and foreclosure.

It appears that this notice properly complied with all of the acceleration-notice requirements set out in Section 22 of the mortgage.  When the default was not cured, an acceleration notice was then sent to the plaintiffs on January 24, 2008.

Plaintiffs' only argument about the sufficiency of this notice appears to be that none of these defendants (meaning MERS and OneWest) sent the notice of default.  Even so, as to the default and 2008 foreclosure proceedings, IndyMac, as the servicer of the mortgage, did so.  Although it is true that the foreclosure did not go forward and the parties negotiated a loan modification agreement, plaintiffs later defaulted again.  No foreclosure has gone forward yet on the now-extant and undisputed default.  Injunctive relief as to *past* foreclosure efforts is moot.  Simply because the attempted foreclosures by IndyMac Federal Bank and OneWest Bank were never completed and perhaps even defective, plaintiffs are not entitled to a *prospective* injunction to prevent the proper party from beginning the acceleration and foreclosure process anew.  Because they are not entitled to prospective injunctive relief as to a *future* foreclosure, plaintiffs are not entitled to summary judgment on this argument.

B. <u>No Authority for 2009 Foreclosure</u>

Plaintiffs argue that the October 2009 foreclosure attempt was defective because (1) MERS lacked any authority on May 1, 2009, to assign the plaintiffs' mortgage to OneWest for foreclosure, and (2) OneWest was not the owner of the indebtedness at that time.   While the court agrees that, by May 1, 2009, MERS had already assigned away the power of sale in the mortgage when it assigned the mortgage in 2008 to IndyMac Bank, it makes no difference.   Any injunctive relief that may have been warranted as to the May 2009 foreclosure is now moot.   The May 2009 foreclosure notices are now long stale and moot, no longer warranting injunctive relief.

Even so, OneWest's right to exercise the power of sale under the mortgage comes not from a direct assignment to it by MERS, but from its status as the successor to IndyMac Bank and IndyMac Federal Bank, through which the mortgage came to OneWest as an asset when each of these preceding banks failed and the FDIC negotiated an assets sale to OneWest.   Under the authority of <u>Crum v. LaSalle Bank</u>, *supra*, OneWest also became the owner of the indebtedness, which followed the mortgage under MERS's original assignment to IndyMac Bank.   That assignment, under the power given MERS in the mortgage to do whatever was "required of Lender," expressly conveyed the mortgage power of sale "together with the note and indebtedness" it secured.   When IndyMac failed, it went to IndyMac Federal Bank.   And when IndyMac Federal Bank failed, it went to OneWest.   Thus, based on the documents now before the court, it appears that OneWest holds both the indebtedness and the mortgage power of sale.   Plaintiffs are not entitled to prospective injunctive relief to prevent OneWest from exercising its rights in the future.[14]

---

[14]   Although not raised as an argument by defendants, the court notes that the equitable doctrine requiring that a party seeking equity must do equity bars injunctive relief for the plaintiffs. They are admittedly in default under the note and mortgage.   Unless they propose to do equity by

VI.  <u>Conclusion</u>

Based on the foregoing considerations, the court finds that there is no genuine dispute of material fact and that the defendants are entitled to judgment as a matter of law. Their motion for summary judgment will be granted by separate order.  The plaintiffs' motion for summary judgment will be denied.

A separate order will be entered.

DONE this 5th day of April, 2013.

_____
T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

---

curing the default, they are not entitled to the equitable remedy of an injunction against future enforcement of the power of sale.